NOT FOR PUBLICATION

FILED
JEANNE A. NAUGHTON, CLERK

JUN - 8 2018

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY_____DEPUTY

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>MICHAEL AND MARY COLOSI,<br><br>Debtors. | Case No. 17-24458 (JNP)<br><br>Chapter 13<br><br>Judge: Jerrold N. Poslusny, Jr. |

## OPINION: (A) APPROVING STRIP-OFF OF McCORMICK'S MORTGAGE; (B) DENYING McCORMICK'S MOTION FOR STAY RELIEF; AND (C) DENYING CONFIRMATION OF DEBTORS' PLAN

Before the Court are the following: (a) the Debtors' motion to strip-off McCormick 106, LLC's ("McCormick") second position mortgage against the Debtors' real property; (b) McCormick's cross-motion for stay relief (the "Cross-Motion"); and (c) confirmation of the Debtors' Chapter 13 plan (the "Plan"). The Plan proposes to refinance the first mortgage on the property and strip-off McCormick's mortgage. McCormick argues that strip-off of its mortgage is not appropriate and that it should be granted stay relief to proceed with a sheriff's sale. For the reasons discussed herein, the Court will deny confirmation of the Debtors' Plan, approve strip-off of McCormick's mortgage, and deny the Cross-Motion.[1]

### A.    Background

The Debtors purchased their residence, located at 59 East Holly Avenue, Sewell, New Jersey (the "Property") in July 1993 for $142,000. On May 21, 2003, the Debtors refinanced the mortgage against the Property with Wells Fargo Bank ("Wells Fargo") in the amount of $131,593. The Wells Fargo mortgage is the first position mortgage against the Property.

---

[1] The Court conducted an evidentiary hearing on these issues on January 26, 2018. At the hearing, both Debtors testified credibly. McCormick cross-examined both Debtors but did not call any witnesses of its own.

In 2006, the Debtors obtained a $125,000 line of credit from Sun National Bank ("Sun") which was secured by second mortgage. On December 1, 2011, the Debtors filed for Chapter 13 Bankruptcy (the "First Bankruptcy"). At the time of the First Bankruptcy, the Property was valued at $192,000 and the Debtors owed Wells Fargo $100,286.14, and Sun $125,368.45. During the First Bankruptcy, the second mortgage was assigned to McCormick.

On October 15, 2015, after receiving relief from the automatic stay, Wells Fargo filed a complaint in the Superior Court of New Jersey, Chancery Division to foreclose upon the Property.

In November 2015, McCormick filed a Motion for Relief from the Automatic Stay, which was granted. On August 9, 2016, McCormick filed a foreclosure complaint in the Superior Court and three months later filed a Motion for Entry of Final Judgment in the Foreclosure Action which the Debtors opposed. On December 13, 2016, the Debtors received their discharge from the First Bankruptcy, and the First Bankruptcy was closed in February 2017.

On February 2, 2017, the Chancery Court entered a Final Judgment of Foreclosure in favor of McCormick and a sheriff's sale was scheduled for June 21, 2017. The Debtors requested their two statutory adjournments, and the sheriff's sale was adjourned to July 19, 2017. On June 26, 2017 the Debtors filed an Emergent Application to Stay Sheriff's Sale in the Chancery Court. After the application was denied the Debtors filed an Application for Permission to File Emergent Motion before the Superior Court of New Jersey, Appellate Division. The Appellate Division denied that motion. Shortly thereafter the Debtors filed this Chapter 13 case (the "Second Bankruptcy").

The Debtors suffered multiple hardships following the filing of their First Bankruptcy. Mr. Colosi suffered serious medical issues beginning in 2011. He testified credibly that he had numerous setbacks that required in-patient and out-patient treatment. Mr. Colosi eventually had

brain surgery in October 2014 and quadruple bypass surgery in May 2015. As a result, the Debtors were required to spend a large sum of their money on life-saving treatments for Mr. Colosi. In addition, Mr. Colosi was out of work for a period of time and previously filed for disability.

Throughout this time, the Debtors repeatedly sought modifications of the mortgages, and were often led to believe that they would be approved. Mr. Colosi testified that Wells Fargo advised him to stop making loan payments in order to qualify for a loan modification. However, no loan modification was ever granted and the missed payments, combined with the medical expenses, left the Debtors quite far behind in their payment obligations and caused them to stop some renovations to the Property prior to completion.

Despite the Debtors' financial setbacks, between 2015 and 2016 they replaced three bedroom doors; re-floored six rooms of the Property at a cost of $8,600; installed new lighting; and repainted the entire downstairs as well as the stairway and upstairs hallway. Many of the repair projects were started with the expectation that a loan modification was imminent.

Mr. Colosi recently accepted a position with M&T Bank and expects to make about $75,000 per year to supplement the social security income that the Debtors receive. Mrs. Colosi credibly testified that she has started working for Instacart, Lyft, Amazon, and other delivery services, and expects to make about $3,000 per month from these jobs.

On the petition date, the Debtors filed the Plan, which proposes to strip-off McCormick's second mortgage and obtain a loan modification with Wells Fargo. McCormick objected to confirmation of the Plan and filed the Cross-Motion. McCormick and the Debtors agree that the Property is worth less than what is owed to Wells Fargo.

NOT FOR PUBLICATION

### B.    Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court.    This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (G), (L), and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[2]

### C.    Discussion

The issues at hand are whether the Plan should be confirmed; whether the Debtors may strip-off McCormick's mortgage; and whether McCormick should be granted stay relief. McCormick argues that the proposed strip-off of its mortgage should be denied and instead McCormick should be granted stay relief because the Debtors acted inequitably due to McCormick's allegation that the Debtors' intentionally devalued the Property.    McCormick further claims that the Plan should not be confirmed because it calls for a loan modification and is therefore speculative and not feasible as required by section 1325(a)(6) of the bankruptcy Code.

*1.    There is No Basis to Grant Stay Relief
as McCormick's Claim is Subject to Strip-Off*

In In re McDonald the Third Circuit held that a wholly unsecured mortgage holder does not hold a secured claim. In re McDonald, 205 F.3d 606, 611 (3d Cir. 2000) (citing Nobleman v. Am. Sav. Bank, 508 U.S. 324, 529 (1993)).    McDonald also states that when there is no value left in the residence after assessing the first mortgage, a second mortgage is wholly unsecured.

---

[2] To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Id. at 608. In this case, the Debtors and McCormick agree the Property is worth less than what Wells Fargo is owed. As such, because McCormick's claim is wholly unsecured, its mortgage is subject to being stripped-off. McDonald, 205 F.3d at 615.

McCormick cites In re Falotico, 231 B.R. 35 (Bankr. D.N.J. 1999), in support of its argument that the Court should not strip-off its mortgage and grant the Cross-Motion. The court there acknowledged that section 1322(b)(2) did not bar the debtor from stripping off a lien. However, the court then examined the debtor's actions prior to the petition date and determined that the bankruptcy had not been filed in good faith and dismissed the case sua sponte. See id. at 40, 42.

In Falotico, the court found bad faith for several reasons. The court reviewed Falotico's previous filings and noted that the lender obtained stay relief early in the first case due to non-payment; the second case was filed on the eve of the foreclosure sale and dismissed because the debtor did not file his schedules; and the third case was filed after adjournments of the sheriff's sale. See id. at 41. The court also noted that the debtor defaulted on the mortgage shortly after obtaining a refinance, and did not pay real estate taxes. See id. Finally, the parties had been negotiating a mortgage modification in exchange for payment of taxes, but rather than perform under that deal, Falotico filed his third bankruptcy. See id. Falotico also failed to upkeep the property. All the while, the debtor was collecting rent from two apartments at the property, but failed to apply rental income against the mortgage, property taxes, or maintenance. See id. at 42.

Although the court noted that non-payment of the mortgage or taxes is not generally grounds to find bad faith, Falotico's actions led to the conclusion that he had not acted in good faith. Id. at 42.

McCormick argues that the Court can deny strip-off of the mortgage for the same reasons that the court in Falotico dismissed that case. However, in Falotico the court held that Falotico's

bad faith required dismissal, not preservation of the lien.  Nevertheless, the Court considers the
Cross-Motion under McCormick's allegations of bad faith.

"[T]he issue of good faith must be determined 'on a case-by-case basis in light of the
totality of the circumstances.'"  Id. at 40 (citing In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996)).
The factors a court should consider under Lilley include: (i) the nature of the debt; (ii) the timing
of the petition; (iii) how the debt arose; (iv) the debtor's motive in filing the petition; (v) how the
debtor's actions affected creditors; (vi) the debtor's treatment of creditors both before and after
the petition was filed; and (vii) whether the debtor has been forthcoming with the bankruptcy
court and creditors.  Id. at 40 (citing Lilley, 91 F.3d at 496).  Here, the totality of the
circumstances noted by the Lilley factors show that the Debtors have acted in good faith.

(i) <em>The Nature of the Debt</em>

The debt in this case is a second mortgage on the Property on which the Debtors fell
behind.  There was no suggestion at the January 26 hearing that the debt was incurred due to
untoward acts by the Debtors.  Moreover, non-payment was due to several factors, such as Mr.
Colosi's health issues and that the Debtors were told at least once to stop making the monthly
mortgage payment to Wells Fargo to secure a loan modification.  This contrasts sharply with the
nature of the debt in Falotico, where the debtor did not pay property taxes or the monthly
mortgage payment despite receiving income from the property.  See Falotico, 231 B.R. at 41.  As
such, this factor weighs in favor of the Debtors.

(ii) <em>The Timing of the Petition</em>

The Debtors filed their petition on the eve of foreclosure, as did Mr. Falotico.  See
Falotico, 231 B.R. at 35.  This does not necessarily constitute bad faith on its own, particularly
when viewed in the totality of the circumstances.  Debtors frequently file petitions shortly before
foreclosure.  However, unlike Falotico, the Debtors filed all of their schedules and statements of

NOT FOR PUBLICATION

financial affairs with the petition and filed the Plan on the petition date. Moreover, Mr. Colosi testified that the Debtors have made all post-petition payments to Wells Fargo and to the Chapter 13 trustee. Both Debtors testified that they have been trying to retain the Property and have made several attempts to modify their mortgages to do so. Moreover, they testified that now that Mr. Colosi is in better health and both Debtors have better job stability, they are able to make payments to fund a plan. Therefore, this factor falls in favor of the Debtors.

(iii)    <em>How the Debt Arose</em>

The debt was a line of credit in consideration for which the Debtors granted a second mortgage. Nothing was presented at the hearing to suggest that the Debtors obtained the line of credit by any bad act, fraudulent conduct, or misrepresentation. This differs from <u>Falotico</u>, where the debt arose from a failure to pay property taxes and make mortgage payments despite receiving rental income from the property. <u>See</u> <u>id.</u> at 41. The Debtors stopped paying the Wells Fargo mortgage hoping to obtain a loan modification, which is one reason why the balance owed to Wells Fargo increased since the First Bankruptcy. When asked why the Debtors did not have money saved due to non-payment of the Wells Fargo mortgage, Mr. Colosi testified that he used the funds to pay for his medication - not for vacations, or other extravagances. Therefore, this factor weighs in favor of the Debtors.

(iv)    <em>The Debtors' Motive in Filing the Petition</em>

The Debtors' motive was twofold. They hope to save the Property from foreclosure, and obtain a fresh start through a feasible plan. This differs from <u>Falotico</u> where the debtor filed a series of incomplete petitions to buy time to resolve his mortgage situation before foreclosure of his property. <u>Id.</u> This factor weighs in favor of the Debtors.

(v)    *How the Debtors' Actions Affect Creditors*

The Debtors seek to strip-off McCormick's mortgage, which negatively affects McCormick. However, the Debtors also propose a modified loan to repay Wells Fargo, which positively affects Wells Fargo. McCormick argues that the Debtors' actions adversely affect the value of the Property which harms creditors. But, the testimony at the January 26 hearing was that Wells Fargo told the Debtors not to make their mortgage payments, to become eligible for a loan modification. The Debtors testified that they had made or started to make repairs and improvements to the Property, which is far more than what was done in <u>Falotico</u>, where the debtor failed to maintain the property. Additionally, the Debtors continually sought a loan modification, and at time when they thought a modification would be forthcoming, they attempted to update the Property in various ways. However, the Debtors were forced to abandon repairs when loan modification did not materialize and money ran dry. Nevertheless, this factor weighs slightly in favor of McCormick, as at least one creditor would be negatively affected.

(vi)    *The Debtors' Treatment of Creditors Before and After the Petition was Filed*

The Debtors treated the creditors with transparency both before and after the filing. The Debtors were communicative with creditors, and were actively attempting to obtain a loan modification. In addition, if not for Mr. Colosi's medical expenses, the Debtors may have been able to continue to pay their debts as they came due. This differs from <u>Falotico</u>, where the debtor was not communicative with his creditors and engaged in stall tactics, including making potentially fraudulent statements of payments to be made, to buy time prior to foreclosure. <u>Id.</u> This factor weighs in favor of the Debtors.

(vii)    *Whether the Debtors Have Been*
*Forthcoming With the Bankruptcy Court and Creditors*

Each Debtor's testimony was credible, and there was nothing shown to indicate deceit or bad intent. Moreover, nothing was presented at the January 26 hearing to indicate that the

NOT FOR PUBLICATION

Debtors have been dishonest with creditors or have hidden information.  This differs from Falotico, where the debtor was unclear on why he failed to pay taxes, and filed several incomplete petitions and was generally attempting to dodge creditors.  Id.  This factor weighs in favor of the Debtors.

Overall, six of the Lilley factors weigh in favor of the Debtors, many of them decidedly. Moreover, the lone factor weighing in favor of McCormick does so only slightly.  Therefore, the Court concludes that the Debtors have shown that they acted in good faith.

Finally, even if there were bad faith at least one court has held that a debtor's bad faith is not relevant.  In re Claar states that, "after taking the First Mortgage into account, there is no equity in the Property to secure the Second Mortgage, then [the second mortgage holder's] claim is unsecured . . . ."  In re Claar, 368 B.R. 670, 675 (Bankr. S.D. Ohio 2007).  Claar holds that avoidance of a second mortgage only turns on whether the lender's claim is "wholly or partially secured."  Id. at 679.  Here, McCormick is wholly unsecured due to Wells Fargo's first position mortgage exceeding the uncontested value of the Property.  McCormick's remedy is not to preserve its second position mortgage but to assert those damages as part of its claim or otherwise.  See id. at 678.  The court in Claar also stated that, "[t]he unsupported assertion that the Debtors may have committed waste or violated their contractual obligation to maintain the Property simply does not impact the Court's determination of the amount of the second mortgage holder's secured claim or alter the conclusion that its wholly unsecured Second Mortgage may be stripped off."  Id. at 679.

Therefore, even if the Debtors did proceed in bad faith, which they did not, they would nevertheless be able to strip-off McCormick's mortgage.  In addition, because the Court finds that the Debtors acted in good faith and the mortgage can be stripped-off, there is no basis to grant stay relief.

2.    *The Plan is Not Feasible*

A Chapter 13 plan must be feasible. 11 U.S.C. § 1325(a)(6). This section provides that a court shall confirm a plan if the debtor will be able to comply with and make all payments under the plan. Id. "To satisfy the feasibility requirement, a debtor's plan must have a reasonable likelihood of success, and the debtor must be able to demonstrate that she has both the present and future capacity to meet the requirements of the proposed plan." Austin v. Bankowski, 519 B.R. 559, 566 (D. Mass. 2014); see also In re Heck, 355 B.R. 813, 823-25 (Bankr. D. Kan. 2006) (debtor's plan was not feasible because she did not have sufficient income to make all payments under the plan). Under a totality of the circumstances test for determining feasibility, the court considers: (1) the debtor's equity in the property at the time of filing; (2) future earning capacity of the debtor; (3) future disposable income of the debtor; (4) whether the plan provides for payment of interest to the secured creditor over the life of the plan; (5) whether the plan provides for payment of recurring charges against the property, including insurance, local property taxes and utility charges; and (6) whether the plan provides for substantial payments to the secured creditor which will significantly reduce the debt and enhance prospects for refinancing at the end of the plan. In re St. Cloud and Jeudi, 209 B.R. 801 (Bankr. D. Mass. 1997).

In a situation where a debtor's ability to make payments under the proposed Chapter 13 plan relies on the refinancing of assets or the selling of properties, a court should deny confirmation when it considers the contingency too speculative. See In re Gavia, 24 B.R. 216, 218 (Bankr. E.D. Cal. 1982) (denying confirmation of a Chapter 13 plan where payments relied on the sale of the debtor's home); Austin, 519 B.R. at 566 (holding that the debtor's plan was not feasible when it relied on a loan modification).

The Plan relies on a loan modification. Plans that rely on loan modifications are not unfeasible per se. But the fact that the Debtors have been denied a loan modification at least six

NOT FOR PUBLICATION

times casts doubt on the feasibility of the Plan and the likelihood that they will be successful in obtaining a loan modification.  See Austin, 519 B.R. at 567 ("[W]ithout a confirmed loan modification [the debtor's] actual future financial obligations are entirely speculative.")  The Debtors have not obtained a loan modification and, considering the previous multiple denials of requests for a modification, the current Plan is speculative in nature.  Therefore, the Plan is not feasible and is unconfirmable.

However, both Debtors testified to changed circumstances in their finances since filing the Plan.  Mr. Colosi expects to make about $75,000 per year working for M&T Bank and Ms. Colosi expects to make approximately $3,000 per month.  And both Debtors expect to receive disability, which would further increase their income.  The Debtors have not yet filed amended Schedules I and J, but at the January 26 hearing, the Debtors testified that with their new sources of income, they would be able to propose a modified plan that would pay off the first mortgage with Wells Fargo, even without a loan modification.  Such a plan may be confirmable, however, the Plan presently before the Court is not.  The Debtors may amend their schedules and file a new plan within twenty-one days.   In addition, if the Debtors are approved for a loan modification with Wells Fargo in the future, they can file a further amended plan at that time.

### D.    Conclusion

For the reasons discussed above, the Debtors may strip off the Lender's mortgage; the Lender's Cross-Motion for stay relief is denied; and confirmation of the Debtors' Plan is denied.  However, the Debtors may propose a new plan within twenty-one days.

Dated:  June 8, 2018

JERROLD N. POSLUSNY, JR.
U.S. BANKRUPTCY COURT JUDGE